CHICKASHA COTTON OIL COMPANY, a
Corporation, and Lockett Seed Company,
a Corporation, Plaintiffs in Error,

v.

L. O. RISINGER, Defendant in Error.

No. 40431.

Supreme Court of Oklahoma.

June 16, 1964.

Oden & Oden, Altus, Ney Sheridan, Jr., Vernon, Tex., for plaintiff in error Lockett Seed Co.

McElroy & Vaughn, Chickasha, for plaintiff in error Chickasha Cotton Oil Co.

Yates & Braddock, Altus, for defendant in error.

BLACKBIRD, Chief Justice.

This action involves alleged damages on account of the sale of cotton seed of substandard germination. The additional background facts are as hereinafter related.

The defendant in error is a cotton farmer and will be referred to herein as "plaintiff". At all times material to this case, the defendant in error Chickasha Cotton Oil Company was engaged, among other things, in conjunction with its operation of a cotton gin at Hess, Oklahoma, in the retail sale of cotton planting seed. The defendant in error, Lockett Seed Company, a Texas corporation, with a business establishment at Vernon, Texas, was engaged in producing and selling such seed in both Texas and Oklahoma; sales in this latter State, being authorized by an out-of-state license permit from Oklahoma's State Department of Agriculture. These companies will hereinafter be referred to as defendants, or by the first words in their names, i. e., "Chickasha" and "Lockett".

After plaintiff's first planting of cotton had been destroyed by hail, he telephoned Mr. Loyd Briscoe, manager of Chickasha's above mentioned cotton gin, on June 8, 1960, about obtaining seed for replanting. As plaintiff, in previous years, had had satisfactory results from the late planting of Lockett, chemically delinted, seed, which he knew to have matured fast, he told Briscoe that was the kind he wanted to buy. Chickasha did not then have any of that variety on hand, but Briscoe promised plaintiff he would attempt to obtain some for him. After being told, upon telephoning Lockett's above mentioned place of business, that he could obtain such seed there, Mr. Briscoe drove to Lockett's place in Vernon and there loaded enough sacks of the Lockett seed into his pickup truck to supply plaintiff with the six sacks he needed, and fill the orders of other farmers who had contacted him for cotton seed of that variety. Without any handling of the six sacks of seed at Chickasha's place of business en route, Briscoe's pickup truck delivered them directly to plaintiff's farm. All of the sacks had regulation tags and tested seed labels on them, representing that their contents had a germination quality of 80%. After plaintiff had, on June 12, 1960, planted the Lockett seed on 42 acres of his land, and it failed to produce a stand by June 21, 1960, he replanted with other seed and obtained a good stand.

In the petition plaintiff thereafter filed in September, 1961, to commence this action against the defendants, he alleged, inter alia, in substance, that the Lockett seed, therein referred to as "defective", was planted under favorable conditions and that, on account of the 10-day delay caused by said planting, his said land produced only 13,639 pounds of lint cotton from the other seed subsequently planted on June 21st, whereas it would have produced 31,248 pounds of such cotton had not the Lockett seed been defective and "considerably below" the 80% germination quality represented on the afore-mentioned tags.

Plaintiff further alleged, in substance, that in the matter of the sale of the Lockett seed, defendants violated " * * * the laws of the State of Oklahoma by selling said seed which had a germination of less than * * *" the 80% represented on the afore-mentioned tags " * * * and are liable to * * * (him) * * * for all damages so sustained." The amount of damages plaintiff alleged he had suffered, and for which he prayed judgment, was $4,402.00.

In its answer, Lockett denied, in substance, that favorable planting conditions for cotton existed in the month of June, 1960, when plaintiff planted the subject cotton seed, and that his failure to obtain a stand of cotton from this planting was due to the claimed defect therein. Said defendant further alleged, among other things, that the seed's failure was due to causes beyond defendant's control. Both of the defendants' answers referred to Oklahoma's "Pure Seed Law" (Tit. 2 O.S. 1959 Supp., sec. 8–21 to 8–29, both inclusive), in brief substance, alleging that plaintiff did not have the subject seed laboratory tested as contemplated by said law and the rules and regulations promulgated by the State Department of Agriculture thereunder and referred to on the sack tags mentioned in plaintiff's petition, without which testing he could not recover. In support of its claim that the seed was not defective, Lockett alleged that germination tests, made subsequent to the sale, verifying and substantiating the representations on the tags attached to the sacks of seed sold plaintiff, demonstrated that said seed was in compliance with the Oklahoma law. Chickasha alleged that " * * * any other evidence as to defective germination, is not based upon any official * * * tests * * * but arises by reason of speculation, conjecture and assumption * * * as to germinating power * * *". Each defendant denied that it was liable to plaintiff in any sum whatsoever.

After the issues were joined by the above mentioned pleadings, and replies filed on behalf of the plaintiff, the cause was tried

before a jury in August, 1962. At the trial, plaintiff introduced in evidence, among other things, and, as identical with the tag that was attached to each of the other five sacks of the Lockett seed he purchased, the "Oklahoma Seed Inspection Tag" appearing on one of them. He also introduced into the evidence, as his Exhibit No. 3, a copy of the "Rules & Regulations for the Enforcement Of the Oklahoma Seed Law." Attached to this document was an affidavit of the Director of its Seed, Feed & Fertilizer Division, that said rules and regulations were adopted by the State Board of Agriculture in 1956.

To support their position that the Lockett seed was not deficient in germination capacity, defendants introduced evidence concerning scientific and laboratory tests that were made on it within six months prior to its sale and both before and after its delinting. They also introduced such tests that were made on some of the same lot, or batch, of seed, as they sold plaintiff, a short time after said sale. The germination shown by all of these tests was 80% or higher.

To support plaintiff's position that the seed was deficient in germination quality, or capacity, he and others, for whom Chickasha's manager, Mr Briscoe, had obtained Lockett seed on the aforementioned occasion in June, 1960, testified as to the appearance of some of the seed, when dug up a few days after it had been planted, and as to the negative results of its planting and to comparisons of these results with those from planting other cotton seed in adjacent, and/or similar soil.

Plaintiff admitted that he had had no laboratory test made of the seed, though his testimony that he had some of the seed left after planting, indicated that he could have done so.

At the close of plaintiff's evidence, defendants demurred to it, and their demurrers were overruled. After all of the evidence was in, and both sides had rested, defendants moved for a directed verdict. These motions were overruled, and, upon submis-

sion of the cause to the jury, a verdict was returned for plaintiff in the amount of $1850.00. After defendants' motions for a new trial were overruled, they perfected the present appeal.

Both defendants urge reversal of the trial court's judgment, on account of its claimed error in overruling their motion for a directed verdict, and the insufficiency of the evidence to support the verdict and judgment. One of the reasons advanced in support of both of such assignments of error is that there was no evidence of a laboratory test showing that the Lockett seed was below the minimum germination standard prescribed by this State's Pure Seed Law, and the rules and regulations of the State Department of Agriculture. They argue, in substance, that under the proper interpretation of this law, such proof is necessary to establish a prima facie of liability under it, citing Manglesdorf Seed Co. v. Busby, 118 Okl. 255, 247 P. 410. Defendants argue that there is a difference between "germination" and "growing", or emerging from the ground, and point to testimony of an expert witness to the effect that seed may have a high percentage germination and yet not produce a good stand, or crop, because of other factors, such as weather, and the manner, and kind of soil, in which it is planted. Defendants cite testimony in this case that plaintiff planted the subject seed in cold, wet ground, after a hail storm, and argue that this case demonstrates the injustice that can result from not requiring the plaintiff, in such a case, to establish alleged deficient germination, by laboratory analysis. Plaintiff, on the other hand, takes the position that proof of the results of laboratory testing or analysis would have been purely cumulative, and was wholly unnecessary.

Plaintiff concedes that his action is not for breach of warranty, express or implied, and seems to take the position that an unspecified kind of tort is involved in the violation of statutory provisions he refers to as the "Pure Seed Law", being Art. 8B of the Oklahoma Agriculture Code (S.L.

1955, pages 64–69) as amended (Tit. 2 O.S. 1959 Supp. sections 8–21 to 8–29, both inclusive).

The Pure Seed Law in effect at the time the Manglesdorf Company Case, supra, arose, was enacted as a part of the Session Laws of 1919. That Act's section 12 (C.O.S.1921, section 3793) provided:

"All persons selling seed for agricultural planting purposes which are faulty or defective, shall be liable in damages in such sum as the purchaser may sustain."

Section 11 (C.O.S.1921, section 3792) of the same Act reads as follows:

"Any citizen of this State shall have the privilege of submitting to the state seed analyst samples of agricultural * * * seeds for tests and analysis, subject to such rules and regulations as may be adopted by said state seed analyst. Provided, that the state board of agriculture may by such regulations fix the maximum number of samples that may be tested free of charge for any one citizen in any one period of time and fix charges for tests of samples submitted in excess of those tested free of charge."

Section 8, Art. 8(B) of the 1955 Law, supra (Tit. 2 O.S.1959 Supp. sec. 8–28), in effect at the time this action arose, provides in part, as follows:

"The State Board of Agriculture shall have authority to promulgate and enforce such rules and regulations as it may deem necessary to carry out, or make effective, the provisions of this subarticle; * * * to prescribe minimum standards of germination * * *; to govern the methods of * * * analysis, tests, and examinations of agricultural * * * seed and the tolerance to be followed in the administration of this subarticle * * *."

Section 6, Art. 8(B) of the Act (Tit. 2 O.S.1959 Supp. sec. 8–26) provides, in part:

"(a) The duty of this subarticle and carrying out its provisions and requirements shall be vested in the State Board of Agriculture, which may act through its authorized agents, and which shall have authority:

"(1) To sample, test, make analysis of, and inspect any agriculture seed or vegetable seed transported, sold, offered or exposed for sale within this State for planting purposes, at such time and place and to such extent *as may be deemed necessary to determine whether such agricultural seed * * * are in compliance with* the provisions of this subarticle and rules and regulations promulgated thereunder.

\* \* \* \* \* \*

"(4) To furnish adequate facilities for seed testing and to employ qualified persons for making such tests." (Emphasis ours).

Regulation No. 5, appearing on plaintiff's Exhibit No. 3, supra, (The State Department of Agriculture's rules and regulations hereinbefore referred to) prescribes a minimum lawful germination percentage, under the Act, of "70". Regulation No. 6 provides that dates of tests on the tags for agricultural seeds shall not be more than 9 months prior to the seed's sale; and it requires re-testing of such seeds that have not been tested within that period prior to their sale. Regulation No. 15 allows "each person in the State of Oklahoma * * *" $4.00 free testing by the State Seed Laboratory each fiscal year and prescribes a charge of $1.00 for each germination analysis, in addition to the free testing. Other provisions of the present law, and rules and regulations promulgated thereunder by the Agriculture Department, provide for the tagging of each sack of seed offered for sale. The hereinbefore mentioned tag, Plaintiff's Exhibit No. 1, bore on its face the following "NOTICE":

"This seed inspection tag is issued by the Oklahoma State Department of Agriculture under authority of the Oklahoma Seed Law. Each bag of seed sold for planting purposes in Oklahoma

must bear one of these tags. Do not accept seed unless this tag is attached and the Vendor's Statement of Analysis is given on the reverse side, or on a separate tag. If seed does not conform to analysis, notify the State Department of Agriculture, Oklahoma City, Oklahoma. Keep all tags, a sample of seed, record of purchase, etc. for reference."

If there is any provision of the above-quoted 1955 Law that is analogous to section 12 of the 1919 Pure Seed Law, supra, it is to be found in the following words of its section 3, Art. 8(B), appearing as section 8–23(b) of Tit. 2 O.S.1959 Supp.:

"It shall be unlawful for any person within this State:

"(1) To sell agricultural * * * seed that does not meet the minimum standards of germination and purity * * * prescribed in rules and regulations promulgated under the provisions of this subarticle. * * *"

In Manglesdorf, supra, however, this court held that the trial court's instruction No. 4, which authorized the jury, in the language of the 1919 Law's section 12, to find the defendant there liable to the plaintiff therein for selling "faulty or defective" seed, was error, when such fact had not been established in a test and analysis by the state seed analyst, in accord with the 1919 Law's above quoted section 11. It would appear that the hereinbefore quoted sections (Tit. 2 O.S.1959 Supp., sections 8–23(b), 8–26, and 8–28) of the Oklahoma Agricultural Code are outgrowths, or modern refinements, of the old 1919 Pure Seed Law, in respect to at least one facet of the relation between the work of the State Department of Agriculture and the successful maintenance of civil actions in damages for unlawfully selling agricultural seed—assuming, without deciding, that the present Law authorizes the maintaining of such actions. As we think the opinion in Manglesdorf, supra, is as authoritative with reference to the kind of proof required by this modern law, as was required by its predecessor, and plaintiff has

advanced no argument which we deem sufficient to show that case's unsoundness as a precedent on that matter, we have concluded that the evidence in this case was incomplete and insufficient to support the cause of action plaintiff pleaded, and attempted to prove, without the kind of proof of the seed's germination quality that has been held to be required for such alleged violations of the old, former statute. It follows, therefore, that the trial court erred in overruling the defendants' motions for a directed verdict. As said court should have sustained those motions on account of this error alone, and without regard to any other, it is unnecessary to discuss other assignments of error urged by defendants. The judgment of the trial court is hereby reversed with directions to said court to vacate same, and enter judgment for the defendants.

HALLEY, V. C. J., and DAVISON, JOHNSON, WILLIAMS, JACKSON and BERRY, JJ., concur.